**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GLADYS' RESTAURANT d/b/a GLADYS', EL JAROCHO MEXICAN RESTAURANT, individually and on behalf of all others similarly situated,<br><br>                              *Plaintiff*,<br><br>v.<br><br>CAVENDISH FARMS LTD.; CAVENDISH FARMS, INC.; J.R. SIMPLOT CO.; LAMB WESTON HOLDINGS, INC.; LAMB WESTON, INC.; LAMB WESTON BSW, LLC; LAMB WESTON/MIDWEST, INC.;LAMB WESTON SALES, INC.; MCCAIN FOODS LIMITED; MCCAIN FOODS USA, INC.; NATIONAL POTATO PROMOTION BOARD d/b/a/ POTATOES USA and CIRCANA, LLC.<br><br>                              *Defendants*. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Gladys' Restaurant d/b/a Gladys' and El Jarocho Mexican Restaurant (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, assert the following against Defendants Cavendish Farms, Ltd., Cavendish Farms, Inc. (collectively, "Cavendish"), J.R. Simplot Company ("JRS"), Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., Lamb Weston Sales, Inc. (collectively, "Lamb Weston"); McCain Foods, Ltd., McCain Foods USA, Inc. (collectively, "McCain"); National Potato Promotion Board d/b/a Potatoes USA ("NPPB") and Circana, LLC ("Circana") (collectively, "Defendants" ) under the federal and state antitrust laws seeking actual damages, injunctive relief, and any other relief that this Court deems just and proper, and demand a trial by jury on all matters so triable.

## I. INTRODUCTION

1. This is an indirect purchaser plaintiff antitrust class action brought by plaintiff Classes consisting of all commercial and institutional indirect purchasers of Frozen Potato Products ("FPPs")[1] that purchased FPPs other than directly from a Defendant or co-conspirator in the United States from at least January 1, 2021 until the present (the "Class Period"). Plaintiff brings this action against NPPB, a major potato industry trade association, and the four largest frozen potato processors – Lamb Weston, McCain, JRS, and Cavendish – ("Defendants") for entering an unlawful conspiracy to raise, stabilize, fix or otherwise manipulate the prices of frozen potato products in the United States (the "Relevant Market"). A conspiracy which resulted in Plaintiffs and other similarly situated commercial indirect purchasers and class members paying supracompetitive prices for FPPs.

2. By at least the start of 2021, Defendants conspired to fix the prices of their Frozen Potato Products above competitive levels. Defendants affected this price-fixing conspiracy through implementation of lockstep price increases that allowed them to realize unprecedented margins. This conspiracy continues to the present.

3. One vehicle through which Defendants implemented their conspiracy is through potato price data aggregation services by Defendant Circana LLC and their market data aggregator "Potato Trac," and collectively through trade associations such as NPPB. These avenues granted Defendants access to each other's data and a direct line of communication with each other, enabling NPPB and its members to maintain supracompetitive prices, drive out discounters, and inflict other harms.

---

[1] In this Complaint, "Frozen Potato Products" or "FPPs" means frozen french fries, hash brown, tater tots and other frozen potato products, processed by Defendants.

4.     Defendants were able to implement these price increases and collectively raise prices in part because their industry is structurally susceptible to collusion. The Frozen Potato Products Market features highly concentrated sellers, high entry barriers, fragmented buyers, repetitive purchases, inelastic demand, and opportunities to collude through common trade associations events and other information exchange mechanisms. FPPs are also a commodity product that lacks substitutes, which further makes collusion more likely. The four dominant processors of FPPS control 97% or more of the $68-billion-per-year Frozen Potato Products market.

5.     Due to Defendant's acts, FPP prices have soared. The following graph shows how Frozen Potato Product prices increased by 38% in price based on yearly average.

| | DOLLAR SALES | | VOLUME SALES (FWE) | | PRICE PER POUND | |
|---|---|---|---|---|---|---|
| | Sales | % Change vs YA | Sales | % Change vs YA | Price | % Change vs YA |
| **FY23** | **$16.9 B** | **16.8%** ▲ | **13.2 B** | **-2.6%** ▼ | **$2.36** | **19.9%** ▲ |
| FY22 | $14.5 B | 6.6% | 13.5 B | -3.1% | $1.97 | 10.0% |
| FY21 | $13.6 B | 2.7% | 13.9 B | -1.0% | $1.79 | 3.8% |
| FY20 | $13.2 B | 11.4% | 14.0 B | 9.7% | $1.72 | 1.6% |
| FY19 | $11.9 B | 1.7% | 12.8 B | -1.2% | $1.70 | 2.9% |

| | Dollar Sales | Dollars $ Change vs YA | % of Dollar Sales | Volume Sales (FWE) | Volume % Change vs YA | % of Volume Sales | Price per Pound | Price % Change vs YA |
|---|---|---|---|---|---|---|---|---|
| Potato Chips | $8,266,939,389 | 13.8% ▲ | 49% | 5,063,217,758 | -2.3% ▼ | 38% | $6.53 | 16.5% ▲ |
| Fresh Potatoes | $4,003,865,940 | 16.5% ▲ | 24% | 3,981,379,521 | -2.7% ▼ | 30% | $1.01 | 19.8% ▲ |
| Frozen Potatoes | $2,781,861,721 | 34.8% ▲ | 16% | 2,330,635,899 | -2.4% ▼ | 18% | $2.03 | 38.1% ▲ |
| Instant Potatoes | $691,809,191 | 15.3% ▲ | 4% | 910,611,769 | -5.2% ▼ | 7% | $4.56 | 21.7% ▲ |
| Refrigerated Potatoes | $765,765,685 | 4.6% ▲ | 3% | 531,126,572 | -2.6% ▼ | 1% | $2.88 | 7.3% ▲ |
| Deli-Prepared Sides | $368,172,758 | 3.9% ▲ | 5% | 258,204,219 | -3.1% ▼ | 6% | $4.42 | 7.2% ▲ |
| Canned Potatoes | $62,709,256 | 19.1% ▲ | 0.4% | 94,901,510 | 9.2% ▲ | 0.7% | $1.06 | 9.1% ▲ |
| **TOTAL** | **$16,941,123,940** | **16.8%** ▲ | | **13,170,077,247** | **-2.6%** ▼ | | **$2.36** | **19.9%** ▲ |

\* Fresh Weight Equivalent (FWE): Potato Chips 4:1, Fresh Potatoes 1:1, Frozen Potatoes 1.7:1, Instant Potatoes 6:1, Refrigerated potatoes 2:1, Deli-Prepared Sides 3.1:1, Canned Potatoes 1.6:1

Figure 1: *Potato Retail Sales See Double-Digit Increases July 2022 – June 2023*[2]

[2] PotatoPro, *United States Potato Retail Sales See Double-Digit Increases July 2022 – June 2023*, (Aug. 6, 2023), https://www.potatopro.com/news/2023/united-states-potato-retail-sales-see-double-digit-increases-july-2022-%E2%80%93june-2023.

6.      Defendants have been able to increase the price of their Frozen Potato Products even after their input costs significantly declined. The following graph shows how Frozen Potato Product prices increased even while the cost index fell dramatically.



Figure 2: *US Potato Outlook 2023/24*[3]

7.      Starting in 2021, while facing increased input costs, Defendants collectively imposed price hikes with no worry their customers could defect to competitors. Frozen Potato Product prices climbed 47% from July 2022 to July 2024. In contrast, Defendants' input costs peaked in 2022 and fell steadily after that. Even today, Defendants' prices continue to climb and remain uncompetitively high.

8.      Meanwhile, the conspiracy resulted in unprecedented margins. In 2023, a former VP at Lamb Weston acknowledged that Lamb Weston, JRS, and McCain "have never ever seen margins this high in the history of the potato industry." The reason for this success was, as he explained, that Defendants "absolutely" have "no incentive to fight that hard for each other's share"; instead, they are all "behaving themselves" to maintain high margins.[4]

---

[3] RaboResearch: Food & Agribusiness, *US Potato Outlook 2023/24: After a Record Breaking Year, What Is in Store for US Potatoes* (May 2023), https://www.potatogrower.com/uploads/12936.pdf.

[4] *Redner's Markets, Inc. v. Lamb Weston Holdings, Inc*., Case No. 1:24-cv-11801 (N.D. Ill. Nov. 15, 2024), at ECF No. 1.

9. Defendants' agreements individually and collectively unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26; state antitrust laws; state consumer protection laws; and common law. Plaintiffs on behalf of themselves, and all similarly situated commercial and institutional indirect purchasers and class members who bought FPPs from January 1, 2021, through the present day, bring this action against Defendants for these violations. Plaintiffs seek actual and treble damages, declaratory and injunctive relief, reasonable costs and attorney's fees, pre- and post-judgment interest, and any other relief the Court deems just and proper.

## II. JURISDICTION AND VENUE

10. *Subject Matter and Supplemental Jurisdiction*. Plaintiffs bring this Action under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, as well as under the state antitrust laws, state consumer protection laws, and the doctrine of unjust enrichment, such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), 1337 and 1367. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert claims arising under the federal antitrust laws, as Plaintiffs bring this Action to remedy violations of the Sherman Act. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 as all the claims arise from the same facts and circumstances and form part of the same case or controversy.

11. Additionally, this Court also has subject matter jurisdiction over Plaintiffs' state law claims under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds the sum of $5,000,000 (exclusive of costs and interest), there are more than 100 putative members of the Classes and minimal diversity exists between the litigants, as one or more of the Class members is a citizen of a state different from Defendants.

12. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendants. Defendants have: (1) transacted business in the United States, including in this District; (2) transacted with members of the Classes throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

13. *Venue.* Venue is proper in this District under 28 U.S.C. § 1391(a), (b), (c), and (d), and 15 U.S.C. § § 15(a) and 22. During the Class Period (defined below), Each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. McCain Foods USA, Inc., has its corporate headquarters and principal place of business in Oak Brook, Illinois, within the Northern District of Illinois.

14. No other forum would be more convenient for the parties and witnesses to litigate this matter.

15. Defendants' anticompetitive behavior apply to and have been implemented and enforced by Defendants and co-conspirators nationwide. Defendants' actions impact interstate trade and commerce by harming competition and consumers alike by raising prices, restricting output and throttling innovation.

## IV. THE PARTIES

### A. Plaintiffs

16. Plaintiff Gladys' Restaurant d/b/a Gladys' ("Gladys'") is a Mississippi corporation with its principal place of business located in Lexington, Mississippi. During the Class Period, Gladys' purchased FPPs indirectly from one of the Defendants for use in their commercial kitchen.

17. Plaintiff El Jarocho Mexican Restaurant ("El Jarocho") is a New York corporation with its principal place of business located in Jamestown, New York. During the Class Period, El Jarocho purchased FPPs indirectly from one of the Defendants for use in their commercial kitchen.

**B.    Defendants**

**<u>Defendant National Potato Promotion Board</u>**

18. Founded in 1971, Defendant National Potato Promotion Board d/b/a Potatoes USA is a business entity with its principal place of business located in Denver, Colorado at 3675 Wynkoop Street.

19. NPPB is a trade association that, amongst its many members, includes the Defendants Lamb Weston, McCain, JRS, and Cavendish Farms, as well as other potato growers and importers.

20. According to NPPB, they are "the only national marketing and research organization focused solely on strengthening the demand for American's Favorite Vegetable."[5] As such its goal is to "coordinate regional, national, and even international research efforts to collect potato-related data on all fronts. We analyze potato volumetric data to help our grower partners understand demand. We facilitate production trials to unearth new potato varieties and market potential."[6]

21. NPPB also uses Circana's data to disseminate information that influences the industry to take certain actions, like adjusting pricing. NPPB does this by combining Circana retailer pricing data with press releases to show general directions for which way sales are going.

---

[5] https://potatoesusa.com/, (last accessed Nov. 19, 2024).
[6] https://potatoesusa.com/about/what-we-do/, (last accessed Nov. 19, 2024).

**Defendant Circana, LLC**

22.    Defendant Circana, LLC is a Delaware limited liability company with its principal place of business located in Chicago, Illinois.

23.    Following the August 2022 merger of two data analytics firms, Information Resources, Inc. and The NPD Group, Circana was created.[7] Circana "is the leading advisor on the complexity of consumer behavior. Through unparalleled technology, advanced analytics, cross-industry data and a deep expertise, Circana provides clarity that helps clients take action and unlock business growth."

24.    PotatoTrac is designed, maintained and/or otherwise affiliated with Circana and Circana's predecessor, The NPD Group. PotatoTrac enabled competitors in the Relevant Market, including the Defendants, to directly exchange data to control supply, costs and downstream pricing through the collection and standardization of their data to monitor or discipline co-conspirators. PotatoTrac's detailed reports provide competitors with a view of the entire market, removing questions of competition on price. Beyond the pricing reports themselves, PotatoTrac allows processors to understand the market using graphs and other helpful graphics to highlight price directions.

**Cavendish Farms**

25.    Cavendish Farms sells Frozen Potato Products in the United States. Defendant Cavendish Farms Ltd. is a Canadian corporation with its principal place of business located in New Brunswick, Canada. Defendant Cavendish Farms, Inc. a subsidiary of Cavendish Farms Ltd., is responsible for Cavendish Farms' U.S. operations and is a Delaware corporation with its principal place of business located in North Dakota.

---

[7] https://www.circana.com/intelligence/press-releases/2023/news-press-releases-iri-and-npd-rebrand-as-circana/

26.     Upon information and belief, Cavendish Farms' market share for FPPs in the Relevant Market is between 7% and 8%.

**Lamb Weston**

27.     Defendant Lamb Weston Holdings, Inc. is a Delaware corporation with its principal place of business located in Eagle, Idaho. It owns and operates a collection of subsidiaries all involved in the production and marketing of Frozen Potatoes, including Defendants Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc. and Lamb Weston Sales, Inc. These subsidiaries are owned as a unitary enterprise.

28.     Lamb Weston Holdings, Inc. is a publicly traded company on the New York Stock Exchange. Lamb Weston is the world's second largest producer of branded and private-label Frozen Potato products, including french fries, tots and hash browns. Approximately 86% of Lamb Weston Holdings, Inc's. products are distributed within the food-service industry, while the remaining 14% are sold at retail.

29.     Lamb Weston and its subsidiaries manufactures, price and sell FPPs in the Relevant Market. Lamb Weston's segment sales for 2023 exceeded $4.2 billion. Upon information and belief, Lamb Weston's market share for FPPs in the Relevant Market is approximately 40%.

**McCain Foods**

30.     Defendant McCain Foods USA, Inc. is a Maine corporation with its principal place of business located in Oakbrook Terrace, Illinois. Defendant McCain Foods USA, Inc. is a wholly owned subsidiary of Defendant McCain Foods Limited, a company existing under the laws of the Province of New Brunswick, Canada, with its principal place of business located at 439 King Street West, 5th Floor, Toronto, Ontario, Canada. McCain Foods USA, Inc. provides frozen potato and other snack foods "primarily for foodservice customers, retail grocers and private label brands in restaurants and supermarket freezers nationwide" in the United States. The company states it

8

has about 4,000 employees spread across its factories in Maine, Idaho, Nebraska, Washington, and Wisconsin.

31. Defendant McCain Foods Limited is a corporation organized under the laws of New Brunswick, Canada, with its corporate headquarters in Toronto, Canada. McCain Foods Limited operates on 47 sites on six continents. McCain Foods Limited states that it owns United States patents. McCain Foods Limited owns over 50 United States trademarks.[8]

32. McCain Foods Limited is a privately owned company, with global revenues in excess of $14 billion Canadian dollars, and a dominant producer of Frozen Potato Products. McCain Foods is one of the world's largest manufacturers of french fries and other potato products. McCain Foods boasts that one in four "fries in the world is a McCain Foods fry."

**J.R. Simplot**

33. Defendant J.R. Simplot Company is a Nevada corporation with its principal place of business located in Boise, Idaho.

34. JRS, a privately owned company with over 13,000 employees worldwide, claims to be one of the world's largest producers of french fries. JRS has admitted in other litigation about Frozen Potato Product patents that it sells products in this District, and that this District and the State of Illinois may exercise personal jurisdiction and venue over JRS.

35. JRS manufactures Frozen Potatoes at facilities throughout the United States. JRS is one of the largest potato companies in the world, with gross revenue in 2020 exceeding $6 billion. At all times relevant to this action, JRS was doing business in the State of Illinois.

---

[8] McCain Foods Limited Trademarks, Justia Trademarks, https://trademarks.justia.com/owners/mccain-foods-limited-116080/index.html (accessed August 26, 2024); McCain Foods Limited Trademarks, page two, Justia Trademarks, https://trademarks.justia.com/owners/mccain-foods-limited-116080/page2 (accessed August 26, 2024).

36.     Its other businesses include food brands, phosphate mining, farming, ranching, and fertilizer manufacturing. Its 2023 revenue was $9.8 billion. JRS is referred to hereinafter as "JRS."

### C.     Co-Conspirators

37.     The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

38.     Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

39.     Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

40.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

41.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supra-competitive prices of Frozen Potato Products.

10

## V. FACTUAL ALLEGATIONS

### A.     Relevant Market

42.     Plaintiffs allege the relevant markets at issue is the market for FPPs in the United States and have pleaded how Defendant's conduct harmed competitive processes in these markets. The Relevant Product Market is the market for FPPs.

43.     According to the National Potato Council, the potato sector within the food industry contributed over $100 billion to the United States economy in 2021. Approximately around 40% of potatoes grown in the United States are frozen and become part of the Relevant Market for downstream consumption by everyday Americans. Downstream purchasers include the food service sector, restaurants, hotels, schools, and hospitals.



Figure 3: Potatoes for frozen products relative to all potato uses[9]

---

[9] USDA Economic Reasearch Service, A *third of U.S.-grown potatoes become frozen french fries used mostly by food service* (Aug. 19, 2020), https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=99117.

44.     The Relevant Market is highly concentrated, as the four potato processor Defendants represent nearly all the production of FPPs in the United States. Upon information and belief, the market share of each member of the conspiracy is as follows:

> i. Lamb Weston: 40%
>
> ii. McCain: 30%
>
> iii. JRS: 20%
>
> iv. Cavendish: 7-8%

**B.      Background on the Frozen Potato Market**

45.     Potatoes are a leading vegetable crop in the United States. Both Idaho and Washington produce more than half of the annual supply, which totaled 424 million cwt in 2019.[10] Per person consumption can be broken down into 49.7 pounds of frozen potatoes, 34.1 pounds of fresh potatoes, 19.8 pounds of potato chips, 11.5 pounds of dehydrated potatoes and less than .5 pounds of canned potatoes.[11] Frozen french fries and other frozen products utilized 176 million cwt of raw potatoes, up 4 percent from 2022.[12]

46.     Defendants purchase potatoes from potato growers and process these potatoes into their products in their facilities. After washing, peeling, and cutting the potatoes, the potato pieces are blanch cooked at a high temperature before freezing the pieces. Among other steps, these frozen potato pieces are then weighed, packaged, labeled and then shipped and sold to customers of the Defendants. These customers include retail and food service customers, as well as distributors who then sell the FPPs to smaller food service and retail entities.

---

[10] Agricultural Marketing Resource Center, ("AgMRC"), https://www.agmrc.org/commodities-products/vegetables/potatoes, (last accessed Nov. 19, 2024).

[11] *Id.*

[12] USDA, Potatoes 2023 Summary: September 2024, https://www.nass.usda.gov/Publications/Todays_Reports/reports/pots0924.pdf (last visited Nov. 19, 2024).

47. A report conducted by Insider Partners estimates that the global frozen potato market is on a trajectory to reach a staggering $92.63 billion by 2030, growing from its $65.06 billion valuation in 2022. This same report notes that the processor Defendants are among the key players operating in the global frozen potato market. "These players adopt merger & acquisition, collaboration, and partnership strategies to expand their footprints across various geographies and cater to a larger customer base."[13]

48. Frozen potato products are also imported into the United States from Canada. For the market year 2019 to 2020, the U.S. imported approximately $750 million worth of Frozen french Fries from Canada, out of a total of $810 million in frozen potato product imports. Notably, Canada exports 91 percent of its frozen potato products to the United States when measured in Canadian dollars. Two Canadian companies, McCain Foods and Cavendish Farms, are responsible for a significant portion of the frozen potato products exported to the United States each year.

49. The food service sector is the largest buying segment for processed potatoes.

50. Frozen french Fries provide the largest part of the FPP market. One source found 579,303 restaurants in the United States feature french fries on their menu. These fries are often served with sandwiches, burgers, and various other food items.[14] In 2014, 57.2 percent of U.S. restaurant menus featured french fries. In 2024 that number rose to 59.6 percent, menu penetration for french fries is expected to grow to a record 60.9 percent by 2028. The region is a major market for frozen potatoes, thanks to a well-established food processing industry and growing trends in

---

[13] GlobalNewswire, *Frozen Potato Market to be Worth $92.63Bn Globally by 2030 - Exclusive Report by The Insight Partners*, https://www.globenewswire.com/news-release/2023/09/27/2750253/0/en/Frozen-Potato-Market-to-be-Worth-92-63Bn-Globally-by-2030-Exclusive-Report-by-The-Insight-Partners.html (Sept. 27, 2023).
[14] The Insight Partners, *Frozen French Fries Market Size to Reach $57.91 Billion Globally by 2030 - Exclusive Report by The Insight Partners*, https://www.globenewswire.com/news-release/2023/09/21/2747145/0/en/Frozen-French-Fries-Market-Size-to-Reach-57-91-Billion-Globally-by-2030-Exclusive-Report-by-The-Insight-Partners.html, (Sept. 21, 2023).

takeaway, dine-in, and on-the-go consumption. Several prominent frozen potato manufacturers, including JRS and McCain, are actively operating in the area. These companies hold significant market shares.[15]



Figure 4: Global Frozen Potato Market Size[16]



Figure 5: Fresh versus frozen uses for potatoes[17]

51. There has been a noticeable increase in the demand for frozen food, driven by rising purchasing power and growing consumer preference for ready-to-eat convenience items. The

---

[15] KBV Research, *Global Frozen Potato Market Size, Share & Industry Trends Analysis Report By End User (Commercial, and Residential), By Product Type, By Regional Outlook and Forecast, 2023 – 2030*, https://www.kbvresearch.com/frozen-potato-market/ (last accessed Nov. 19, 2024).
[16] *Id.*
[17] USDA Economic Research Service: Fries on the rise: Nearly half of potatoes now go into frozen products , https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=107266 (last updated Aug. 29, 2023).

popularity of ready-to-eat, microwavable, and easy-to-prepare food products is significantly rising, as they are well-suited for on-the-go consumption and require minimal preparation time. In the french fries market, products are divided into fresh and frozen categories. In 2023, frozen fries accounted for 59.45% of the market share.

**B.      Prices for Frozen Potato Products Rose Dramatically as a Result of Defendants' Collusion.**

52.      Defendants acted in concert to fix, raise, maintain, and stabilize the price of Frozen Potato Products they manufactured, distributed, sold, or imported into the United States. This unlawful conspiracy in restraint of trade began at least as early as January 1, 2021 and continues to the present.

53.      Defendants coordinated price increases at identical or near-identical times during the Class Period to the detriment of the Plaintiffs and the Classes. Defendants acted in concert to fix, raise, maintain and/or stabilize the price of FPPs that they manufactured, distributed, sold or imported into the United States. Beginning as early as January 1, 2021, Defendants' primary avenue of coordinating and fixing prices in the Relevant Market was by using potato price data aggregation services (including Circana, Inc.'s "PotatoTrac") and collective action through trade associations like NPPB.

54.      *PotatoTrac*. Since as early as 2008, and continuing into the present day, Circan collected and collects sensitive, proprietary pricing data on "all potato products moving from manufacturers to food service outlets – restaurants, schools, hospitals and the like." PotatoTrac gathers data for "a survey of food service suppliers."[18]

---

[18] Since as early as 2008, and continuing into the present day, Circana (f/k/a NPD, Inc.) collected and collects sensitive, proprietary pricing data on "all potato products moving from manufacturers to food service outlets – restaurants, schools, hospitals and the like."

55.     A 2008 Q3 PotatoTrac report described PotatoTrac as "a cooperative, wholesale and foodservice measurement service providing [individual item] level data for all frozen potato shipments from the four major frozen potato processors – Cavendish, Lamb Weston, McCain and JRS – to all U.S. foodservice customers as well as foodservice exports from the U.S. to foreign countries.[19] The report continues, "[t]he data collected is categorized, and combined totals are played back to … those four processors[.]"[20]

56.     Defendants have strategically utilized the aggregated pricing data to coordinate their pricing, effectively moving in unison to artificially inflate the price of FPPs.

57.     Defendants' FPP prices increased in 2021 and then increased even more precipitously in 2022, continuing to remain high through to the present, resulting in unparallel margins for Defendants. Data from the Federal Reserve Bank of St. Louis indicated that as of August 1, 2024, Frozen Potato Product prices were at their highest recorded levels since 1967.

58.     These increased prices cannot be explained by cost input changes. From July 2022 to July 2024, FPP prices increased by approximately 47%. During that same period, Defendants' input costs *decreased*. However, despite the declining input costs, Defendants' prices for their FPPs remained uncompetitively high, a reality allowed to exist by way of the conspiracy.

59.     By ensuring that no price competition occurs, they have cemented their control over the market, exemplifying their collusion in this manipulation. For example:

        a.      In January 2021, JRS, Cavendish, and McCain all announced price increases within days of each other. Lamb Weston did not formally announce a price increase at that time, but increased prices more quietly in

---

[19] https://www.potatogrower.com/2009/02/potatotrac-reports-give-marketing-data, (last accessed, Nov. 17, 2024).
[20] *Id.*

the same time period. This would begin back and forth price increases that would continue for the remainder of the Class Period.

b.    In February of 2021, McCain announced price increases which were soon matched by JRS and Cavendish Farms.

c.    In May 2021, Lamb Weston and McCain sent price increase letters within two weeks of each other. The Lamb Weston letter indicated that prices would increase by $0.08 per pound, while the McCain letter indicated prices would increase by $0.04 per pound. The letters sent by Lamb Weston and McCain had effective dates of July 1, 2021 and July 15, 2021, respectively. On June 4, 2021, Cavendish sent letters indicating prices would increase by $0.04 per pound. The Cavendish letter had an effective date of July 15, 2021, the same day as McCain's price increase.

d.    In September of 2021, Lamb Weston increased prices and Lamb Weston's then vice president correctly predicted that McCain would be pleased with the price increase and would follow in tandem, "it will probably be the exact same price increase that McCain wanted … they will announce a price increase."

e.    In October 2021, Lamb Weston, McCain, and Cavendish each sent price increase letters within five days of each other. The price increase letters all indicated that the cost of Frozen Potatoes would increase by $0.08 per pound, and all had the same effective date—December 15, 2021.

f.    On February 11, 2022, Lamb Weston increased prices again, which would take effect in April of 2022, increasing prices on certain products by up to $0.12 per pound.

g.    Four days later, on February 15, 2022, JRS and McCain both announced the same price increases.

h.    The very next day, on February 16, 2022, Cavendish announced process increases, also of $0.12.

i.    In April of 2022, JRS's director of sales at the time stated about moving prices in tandem with their competitors, "that's what we did … like Lamb, they did [an increase] like we did[.]"

j.    In May of 2022 and July of 2022, JRS increased prices again – and Lamb Weston followed suit with a similar price increase in July of 2022.

k.    In 2023, JRS's director of sales stated that JRS, McCain, and Cavendish were continuing to "push pricing" and would "not [go] after new business" in response to Lamb Weston increasing prices by as much as 35%. Lab West's former vice president of international business stated that the Defendants "have never seen margins this high" in the potato industry and that Defendants have "no incentive to fight that hard for each other's [market] share." He stated that Defendants were "behaving themselves" in order to maintain high margins and that "… [Defendants] have done a pretty good job at taking margins with these price increases."

l.    In 2024, a former senior director at McCain noted that McCain was unwilling to compete with Lamb Weston on pricing and that they should pursue more   market share – but that the "higher ups" insisted on not competing.

60.    By collusively manipulating FPP prices, each Defendant, acting individually, risks one of its competitors undercutting their prices to capture market share. Competition on the merits

would not allow for a single FPP producer to exceed certain price thresholds beyond input costs without losing market share due to another competitor undercutting those prices. Thus, Defendants' price increase actions are against their own interests, individually. Yet, by acting collusively, Defendants align their interests and follow their collective interest as opposed to their individual interests through collective price increases, allowing these supracompetitive prices to persist.

61.     The software used by Circana's PotatoTrac statistical analysis –allowed each Defendant to disseminate and observe competitively sensitive industry data.  Thus, because each of the Defendants subscribe to PotatoTrac, they agreed to enter a conspiracy to have access to the same data to set and control market-wide pricing.

62.     The National Potato Promotion Board (NPPB) provides a method for the Defendants to communicate with one another, while also facilitating joint marketing efforts, sharing updates on export sales, and enabling the exchange of data among the four producers. The NPPB also grants defendants access to PotatoTrac data through quarterly reports, allowing a broader range of potato-related entities to participate in the coordinated effort to raise prices to supracompetitive levels.[21]

## VI.    ANTITRUST INJURIES

63.     As a direct result of the conduct described in this complaint, commercial indirect purchasers are forced to pay supracompetitive prices for FPPs in the Relevant Market and have been throughout the Class Period. Additionally, they have been harmed by the lack of price competition between the Defendants. This is because the Defendants, having decided to manipulate and coordinate prices in lockstep, have throttled any incentive to compete on price, quality, service or other types of innovation.

---

[21] https://potatoesusa.com/about/assessment-faqs/, (last accessed, Nov. 17, 2024).

64.    During the Class Period, the price of potatoes has increased by as much as 43% at retail. Between July 2023 and June 2024, the most significant increase dollar sales amongst the categories of potatoes sold was FPPs at 14.6%.[22] According to NPPB, using PotatoTrac, this was due to "sharp increases in price for frozen products."[23] Plaintiffs and Class members paid higher prices for FPPs and continues to pay higher prices for FPPs because of Defendants' conduct.

## VII.    THE CAPPER VOLSTEAD IMMUNITY DOES NOT APPLY

65.    The Capper-Volstead Act, passed in 1922 as the Co-operative Marketing Associations Act (P.L. 67-146)(7 U.S.C. §§ 291, 292), grants certain agricultural producers and exemption under the antitrust laws when these producers are acting "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their agricultural products. Capper-Volstead Act, § 1. These agricultural cooperative "associations and their members may make the necessary contracts and agreements to effect such purposes."

66.    The Capper-Volstead Act allows these producers, as part of the cooperative association, to agree on prices and terms of sale, engage in joint marketing activity, agree on common marketing practices with other cooperatives, engage in other combined activities to promote market efficiency, which absent the Act, would run afoul of the Sherman Antitrust Act.

67.    Immunity under the Capper-Volstead Act is not absolute; it extends only to organizations or cooperatives whose membership consists exclusively of producers of agricultural products and which are involved in processing, preparing for market, handling or marketing the agricultural products of its members.

68.    The straightforward language of the Capper-Volstead Act does not provide immunity for preproduction output restraints. Congress did not give cooperatives the authority to

---

[22] https://potatoesusa.com/news-events/frozen-potato-demand/, (last accessed, Nov 17, 2024).
[23] *Id.*

limit supply; instead, it granted them the power to help producers market the agricultural products that are already available.

69.     The Capper-Volstead Act requires that cooperatives operate for the mutual benefit of their members and limits the immunity it provides to those cooperatives that grant equal voting rights to all members. Specifically, no member can have more than one vote, regardless of the amount of stock or membership capital they hold. The limited protections of the Capper-Volstead Act disappear if the cooperative is not exclusively composed of producers. If even one member of the cooperative is not a producer, the protections of the Capper-Volstead Act will not apply. Additionally, even if an individual producer qualifies as a Capper-Volstead entity, they will lose this immunity if they conspire with an entity that does not qualify under the Capper-Volstead Act.

70.     Capper-Volstead flatly does not apply here. Defendants' activities are characterized as anticompetitive and predatory. Defendants' actions do not foster market efficiency and lack any legitimate business justification. The primary aim of the conspiracy is to artificially raise the sales price of frozen processed potatoes (FPPs) in the United States, which Defendants in this matter have done.

## VIII.    CLASS ACTION ALLEGATIONS

71.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and b(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> **Nationwide Class.** All commercial and institutional purchasers, natural persons business, entities and corporations in the United States and its territories who indirectly purchased the Defendants' FPPs beginning on January 1, 2021, through the present day for their own business use in commercial food preparation.

72.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer

protection laws of the state and territories listed below (the "Indirect Purchaser States")[24] on behalf of the following class (the "Damages Class"):

> **Damages Class.** All commercial and institutional purchasers in the Indirect Purchaser States that purchased Frozen Potato Products, once or more, indirectly from Defendants, from January 1, 2021, through the present day for their own business use in commercial food preparation.

73.     Excluded from the Classes are (1) Defendants and Defendants' subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; (2) Plaintiffs' counsel; and (3) the Court and its personnel.

74.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes at a later date.

75.     *Numerosity.* Both Classes are so numerous that joinder would be impracticable. While Plaintiffs do not know the exact number of the members of the Classes, there are likely hundreds of thousands of class members.

76.     *Commonality.* There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

> i. Whether Defendants violated the federal and state antitrust laws;
>
> ii. Whether Defendants engaged in anticompetitive conduct;
>
> iii. whether Defendants were unjustly enriched;
>
> iv. Whether Plaintiffs were harmed;

---

[24] The Indirect Pruchaser States include the following state (and territory): Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, West Virginia and Wisconsin.

v. Whether Plaintiffs are entitled to declaratory relief and injunctive relief to end Defendant's conduct, and;

vi. Whether Plaintiffs and Class members are entitled to damages and other relief.

77. *Typicality*. Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like every other Class member, were harmed by Defendants' anticompetitive conduct alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiffs. The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

78. *Adequacy of Representation*. Plaintiffs will fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Classes. The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Classes. Plaintiffs have retained counsel experienced in antitrust class action litigation, and Plaintiffs intend to prosecute this action vigorously.

79. *Superiority of Class Action*. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Classes will remain unaware of the claims they may possess.

80. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

81. Adequate notice can be given to Class members directly using information maintained in the parties' records.

82. *Predominance*. The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

83. This proposed class action does not present any unique management difficulties.

<u>CAUSES OF ACTION</u>
<u>COUNT I</u>

**VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. §§1, 3)**

CONSPIRACY IN RESTRAINTS OF TRADE

84. Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as though fully set forth herein.

85. From at least January 1, 2021, until the effects of their unlawful conduct cease, Defendants entered and engaged in a contract, combination, conspiracy or agreement to unreasonably restrain trade in violation of the Sherman Act.

86. Defendants did this by artificially restraining competition with respect to the price of FPPs sold within the United States; Defendants created a cartel which has caused Plaintiffs and Class members to suffer overcharge damages.

87. There are no procompetitive justifications for Defendants' price-fixing agreements, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

88. Defendants' conspiracy is unlawful under a per se mode of analysis.

89. Defendants' conduct caused Plaintiffs and Class members to pay supracompetitive prices for FPPs in the Relevant Market.

90. Defendants' conduct has a substantial effect on interstate commerce.

91. Plaintiffs have suffered and will continue to suffer the type of injury that the antitrust laws were intended to prevent. Plaintiffs have also been harmed by loss of competition in the Relevant Market due to Defendants' conduct.

92. Plaintiffs seek injunctive relief, a declaratory judgment as well as costs and attorneys' fees, with respect to this cause of action.

## COUNT II

**VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. §§1, 3)**

CONSPIRACY TO EXCHANGE COMPETITIVELY SENSITIVE INFORMATION

93. Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully realleged and set forth herein.

94. Defendants and their co-conspirators entered into continuing agreement to regularly exchange detailed, timely, competitively sensitive information which is non-public and is about their operations. This agreement is an unreasonable restraint of trade under the Sherman Act.

95. The information regularly exchanged by Defendants pursuant to the agreement has consisted of and does consist of information about supply, production and pricing of FPPs. Defendants' regular information exchanges through PotatoTrac reflected an independent concerted action between horizontal competitors in the Relevant Market. Indeed, each Defendant furnished competitively sensitive information with the understanding it would be reciprocated.

Circana enforced this understanding by requiring Defendants to share data in order to receive comparable data.

96. The agreement to regularly exchange this information through PotatoTrac about production, supply and price suppressed competition between the Defendants and could not have been done without the assistance of Circana.

97. Accordingly, Defendants used the data obtained through PotatoTrac to reduce the uncertainty that they would have individually faced from not knowing what their competitors were offering and providing in terms of price in the market for FPPs. This strategic information was a material factor in the decisions to inflate prices that Plaintiffs paid for FPPs during the Class Period.

98. Defendants' unlawful agreements to exchange, and the actual decision to exchange, this data was not reasonably necessary to further any procompetitive purpose. The information exchange has had the effect of (1) reducing and suppressing competition among Defendants in the market for FPPs and (2) inflating the price of FPPs during the Class Period. As a result of this conduct, Plaintiffs and Class members have been injured in their business or property by paying artificially inflated prices for FPPs during the Class Period.

## COUNT III

### VIOLATIONS OF THE STATE ANTITRUST STATUTES

99. Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully realleged and set forth herein. The anticompetitive conduct as alleged herein violates the state antitrust laws of the following states for the same reason that they violate federal antitrust laws.

100. **Arizona**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

101. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPP.

102. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

103. **California**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

104. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

105. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

106. **Connecticut**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

107.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

108.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

109.    **District of Columbia**. Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code § 28-4501, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

110.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

111.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

112.    **Illinois.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

113.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

114.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

115.     **Iowa**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

116.     Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

117.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

118.     **Kansas**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. § 50-101, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

119.     Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

120.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

121.     **Maine**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

122.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

123.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

124.    **Michigan**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

125.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

126.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

127.    **Minnesota**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

128.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

129.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

130. **Mississippi.** Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code § 75-21-1, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

131. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

132. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

133. **Nebraska**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

134. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

135. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

136. **Nevada**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

137.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

138.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

139.    **New Hampshire**. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

140.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

141.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

142.    **New Mexico**. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

143.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

144. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

145. **New York**. Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

146. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

147. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

148. **North Carolina**. Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

149. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

150. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

151. **North Dakota**. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

152. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

153. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

154. **Oregon**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

155. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

156. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

157. **Rhode Island**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

158.     Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

159.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

160.     **South Dakota**. Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

161.     Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

162.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

163.     **Tennessee**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

164.     Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

165.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

166.    **Utah**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

167.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

168.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

169.    **Vermont**. Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann §2453, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

170.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

171.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

172.    **West Virginia**. Defendants have entered into an unlawful agreement in restraint of

trade in violation of West Virginia Code § 47-18-3 *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

173.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

174.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

175.    **Wisconsin**. Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. § 133.01, *et seq*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

176.    Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs.

177.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## COUNT IV

### VIOLATION OF STATE CONSUMER PROTECTION STATUTES

178.    Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

179.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

180.    **Arkansas**. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. § 4-88-101, *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

181.    **California.** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

182.    **Florida.** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

183.    **Illinois**. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

184.    **Minnesota**. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

185.    **New Mexico**. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

186. **North Carolina**. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

187. **South Carolina**. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

188. **Vermont**. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

189. **Wisconsin**. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection

Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants' conduct has had the following impacts: price competition for FPPs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of FPPs. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## COUNT V

### UNJUST ENRICHMENT[25]

190. Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

191. Plaintiffs and Class members paid higher prices for FPPs in the Relevant Market.

192. Plaintiffs and Class members paid higher prices that what would have otherwise occurred in a market free of Defendants' conduct.

193. Plaintiffs and Class members conferred a benefit upon Defendants with their money. Specifically, they paid for FPPs. In exchange for paying for FPPs, Plaintiffs and Class members received FPPs. Defendants knew that Plaintiffs and Class members conferred a benefit which Defendants directly accepted. Defendants profited heavily from these transactions.

194. Defendants would not have profited as much as they have and continue to profit but for their anticompetitive conduct, for which Plaintiffs and Class members were entirely unaware.

---

[25] Unjust enrichment claims are alleged herein under the laws of the following states: Arkansas, Arizona, California, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

195.    Under principles of equity and good conscience, Defendants should not be entitled to retain the money made through these unconscionable acts.

196.    Plaintiffs and Class members have no other adequate remedy at law.

197.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered injury (and will continue to suffer injury) including in the form of higher prices in the Relevant Market.

198.    Defendants should be compelled to disgorge profits from this unlawful scheme into a common fund for the benefit of the Plaintiffs and the Class members. In the alternative, Defendants should be compelled to return or refund the amounts that Plaintiffs and Class members overpaid for Defendants' FPPs.

## VI. REQUESTED RELIEF

199.    To remedy these illegal acts, Plaintiffs request the following relief:

a.    That the Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to members of the Class, once certified;

b.    That the unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade to commerce in violation of Section 1 do the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively, (d) acts of unjust enrichment by Defendants as set forth herein.

c.    That the Court award Plaintiffs and the other members of the Damages Class damages and/or restitution in in the amount to be determined by a jury, inclusive of treble damages as provided by the antitrust laws;

d.    That the Court award Plaintiffs pre- and post-judgment interest;

e.    That the Court award Plaintiffs their costs of suit, including reasonable attorney's fees and expenses;

f.    That the Court permanently enjoin and restrain Defendants from establishing the same or similar rules, policies, or practices as those challenged in this action in the future. Permanently enjoining each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, restraining them against, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

g.    Granting to Plaintiffs and Class any such and other relief to which they may be entitled and which this Court deems just and proper.

## V. DEMAND FOR JURY TRIAL

200.    Plaintiffs demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: November 22, 2024                    Respectfully submitted,

*/s/ Shannon M. McNulty*

Robert A. Clifford
Shannon M. McNulty
**CLIFFORD LAW OFFICES PC**
120 N. LaSalle Street
Suite 3100
Tel: (312) 899-9090
rac@cliffordlaw.com
smm@cliffordlaw.com

Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**

43

Two CityPlace Drive
Second Floor
St. Louis, MO 63141
Tel: (314) 226-1015
mflannery@cuneolaw.com

Evelyn Riley (*pro hac vice* forthcoming)
Daniel Cohen (*pro hac vice* forthcoming)
Cody McCracken (*pro hac vice* forthcoming)
DaJonna Richardson (*pro hac vice* forthcoming)
**CUNEO GILBERT & LADUCA, LLP**
2445 M St. NW
Suite 740
Washington, D.C. 20037
Tel: (202) 789-3960
Fax: (202) 789-1813
evelyn@cuneolaw.com
danielc@cuneolaw.com
cmccracken@cuneolaw.com
drichardson@cuneolaw.com

Sterling Aldridge (*pro hac vice* forthcoming)
John W. "Don" Barrett (*pro hac vice* forthcoming)
Katherine Barrett Riley (*pro hac vice* forthcoming)
David McMullan (*pro hac vice* forthcoming)
**BARRETT LAW GROUP, P.A.**
404 Court Square N
Lexington, MS 39095
Tel: (662) 834-2488
Fax: (662) 834-2628
saldridge@barrettlawgroup.com

Arthur N. Bailey
Marco Cercone
**RUPP PFALZGRAF, LLC**
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
bailey@rupppfalzgraf.com
cercone@rupppfalzgraf.com

*Counsel for Plaintiffs and the Proposed Class*